Filed 9/30/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SUSANNAH LEVY et al., | |
|     Plaintiffs and Appellants, | A172068 |
|     v. | |
| CITY AND COUNTY OF SAN FRANCISCO, | (San Francisco City & County Super. Ct. No. CGC24612166) |
|     Defendant and Respondent. | |

In 2022, the Legislature enacted Senate Bill No. 1334 (2021–2022 Reg. Sess.) (Senate Bill 1334), adding section 512.1 to the Labor Code.[1] (Stats. 2022, ch. 845, § 2.)  Section 512.1 extends the meal and rest breaks and premiums already enjoyed by private sector health care workers under section 512 to healthcare employees directly employed by specified public employers.  (§ 512.1, subd. (a).)  As used in section 512.1, " '[e]mployer' means the state, political subdivisions of the state, counties, municipalities, and the Regents of the University of California."  (§ 512.1, subd. (e)(2).)

Plaintiffs are nurses directly employed by the City and County of San Francisco (City), who, on behalf of a class of similarly situated City-employed nurses represented by the Service Employees International

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

Union Local 1021 (the union), alleged that the City has failed to comply with section 512.1 since it took effect. The City demurred. It argued that the Legislature failed to provide a clear intention that the law applies to charter cities, like the City. In the alternative, the City argued that applying the law to charter cities would be unconstitutional.

The trial court sustained the demurrer. The court agreed with the City's statutory interpretation and did not address the constitutional question. We affirm.

## I. BACKGROUND

### A. The Legal Context Prior to Senate Bill 1334's Introduction

#### 1. *Public Entities Not Subject to General Laws, Including Section 512's Meal Period Requirements*

"[T]raditionally, 'absent express words to the contrary, governmental agencies are not included within the general words of a statute.' [Citation.] The Legislature has acknowledged that this rule applies to the Labor Code." (*Johnson v. Arvin-Edison Water Storage Dist.* (2009) 174 Cal.App.4th 729, 736.) Section 512 "do[es] not expressly apply to public entities." (*Johnson,* at p. 733.) Accordingly, *Johnson* held that section 512's meal period requirements for employees did not apply to a water storage district "designated as a 'public agency of the State of California.'" (*Johnson*, at p. 733.)

#### 2. *Regents of the University of California's Authority over Internal Affairs, Including Time-Keeping Procedures*

" 'The California Constitution establishes the Regents [of the University of California] as a "public trust . . . with full powers of organization and government." (Cal. Const., art. IX, § 9, subd. (a).)' [Citation]" (*Gomez v. Regents of University of California* (2021) 63 Cal.App.5th 386, 393 (*Gomez*).) " ' "[A]s a constitutionally created arm

2

of the state" ' " the Regents of the University of California " ' "have virtual autonomy in self-governance" ' " and enjoy " 'general immunity from legislative regulation.' " (*Ibid.*)

There are three areas of legislative regulation carved out of University of California's Regents' immunity. (*Gomez, supra,* 63 Cal.App.5th at p. 393.) " 'First, the Legislature is vested with the power of appropriation, preventing the [R]egents from compelling appropriations for salaries.' [Citation.] 'Second, it is well settled that general police power regulations governing private persons and corporations may be applied to the university. . . .' [Citation.] 'Third, legislation regulating public agency activity not generally applicable to the public may be made applicable to the university when the legislation regulates matters of statewide concern not involving internal university affairs.' " (*Ibid.*)

"Nonetheless, '[c]ourts have consistently held the Regents are exempt from statutes regulating the wages and benefits of employees and other workers, including those pertaining to prevailing wages, overtime pay, and indemnification for the cost of work uniforms and maintenance, on the ground those matters are internal affairs of the university that do not come within any of the exceptions to constitutional immunity.' " (*Gomez, supra,* 63 Cal.App.5th at p. 394.) *Gomez* held that neither the Labor Code nor Wage Order No. 4 established that the minimum wage laws apply to the Regents. (*Gomez,* at pp. 400–404.)

3. *Charter Cities' Constitutional Home Rule Authority over Employees' Compensation, Including Meal and Rest Periods*

"California law recognizes two types of cities. A city organized under the general law of the Legislature is referred to as a general law city. (Gov. Code, § 34102.) A municipality organized under a charter . . . is a charter

3

city.  (Gov. Code, § 34101.)" (*City of Redondo Beach v. Padilla* (2020) 46 Cal.App.5th 902, 909 (*Redondo Beach*).)

The California Constitution grants substantial "home rule" powers to local governments that adopt a charter to operate their own government. (Cal. Const., art. XI, §§ 3–6.)  To wit, a charter city may " 'make and enforce all ordinances and regulations in respect to municipal affairs'; with respect to such matters, the cities' charters 'supersede all laws inconsistent therewith.' (Cal. Const., art. XI, § 5, subd. (a).)" (*City and County of San Francisco v. Regents of University of California* (2019) 7 Cal.5th 536, 545 (*San Francisco v. Regents*).)[2]  When legislation that applies to charter cities conflicts with their home rule authority, courts utilize a four-part analytical framework to determine whether the city's authority must cede to the state's.  (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 556 (*Vista*), citing *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 16–24 (*Cal. Fed.*).)[3]

---

[2] Article XI, section 5, subdivision (a) of the California Constitution provides:  "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws.  City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

[3] "First, a court must determine whether the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair.' [Citation.]  Second, the court 'must satisfy itself that the case presents an actual conflict between [local and state law].' [Citation.]  Third, the court must decide whether the state law addresses a matter of 'statewide concern.' [Citation.]  Finally, the court must determine whether the law is 'reasonably related to . . . resolution' of that concern [citation] and

4

A charter city has explicit home rule authority over its employees' compensation. (Cal. Const., art. XI, § 5, subd. (b); *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 316.) Courts have held that such authority extends to employees' meal and rest periods linked to compensatory pay. (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 645 ["[T]he provisions of Labor Code section 512 prescribing meal periods, and Labor Code section 226.7 providing a premium wage as compensation for missed meal and rest periods, are matters of compensation within [a chartered county's] exclusive constitutional purview."] (*Curcini*); *Dimon v. County of Los Angeles* (2008) 166 Cal.App.4th 1276, 1282–1283 [same] (*Dimon*).)

We take judicial notice of the City's status as a consolidated charter city and county. (*The Kennedy Com. v. City of Huntington Beach* (2017) 16 Cal.App.5th 841, 852 [taking judicial notice of city charter].) "San Francisco, as California's only consolidated city and county, enjoys the greater degree of autonomy that comes with charter city status. (Cal. Const., art. XI, § 6, subd. (b).)" (*San Francisco v. Regents*, *supra*, 7 Cal.5th at p. 545, fn. 2.)

---

'narrowly tailored' to avoid unnecessary interference in local governance [citation]. 'If . . . the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments.' " (*Vista*, *supra*, 54 Cal.4th at p. 556.)

### B.    Senate Bill 1334's Legislative History[4]

Senate Bill 1334 was introduced in February 2022, as "[a]n act to add Section 512.1 to the Labor Code, relating to employment." (Sen. J. (2021–2022 Reg. Sess.) p. 2960).  The Legislative Counsel's digest notes that Senate Bill 1334 sought to statutorily entitle "employees who provide direct patient care or support direct patient care in a general acute care hospital, clinic, or public health setting directly employed by *specified public sector employers*" to meal periods and rest breaks.  (Legis. Counsel's Dig., Sen. Bill 1334, as introduced Feb. 18, 2022, p. 1, italics added.)  The bill was designed to "require these employers, if they fail to provide an employee a meal period or rest period in accordance with the bill, to pay the employee" a premium wage.  (*Ibid.*)  The bill also contemplated an exemption for employees covered by a collective bargaining agreement so long as such an agreement provided for meal and rest breaks and "include[d] a prescribed monetary remedy" for missed breaks.  (*Ibid.*)

As originally introduced, the bill defined " 'Employer' " to mean "the state, political subdivisions of the state, municipalities, and the Regents of the University of California." (Legis. Counsel's Dig., Sen. Bill 1334, as introduced Feb. 18, 2022, p. 3.)

An April 2022 bill analysis of Senate Bill 1334 by the Senate Committee on Labor, Public Employment and Retirement (April 2022 bill analysis) framed Senate Bill 1334's key issue as follows:  "Should employees providing direct patient care in a general acute care hospital, clinic or public health setting – and working for *specified public sector employers* including the University of California – be statutorily entitled to

---

[4] We take judicial notice of the legislative history of Senate Bill 1334. (Evid. Code, § 452, subd. (c).)

take a 30-minute meal period and a 10-minute rest period like employees providing the same care in the private sector already receive?" (Sen. Com. on Labor, Public Employment and Retirement, Analysis of Sen. Bill 1334, as amended Mar. 29, 2022, p. 1, italics added.)

Comments to the April 2022 bill analysis emphasized that "existing labor code provisions entitle *private sector* employees" to meal and rest breaks and a premium wage compensation if a required meal or rest break is not provided. (Sen. Com. on Labor, Public Employment and Retirement, Analysis of Sen. Bill 1334, *supra*, as amended Mar. 29, 2022, p. 3.) The comments continued: "In general, California Labor Code regulates private employment unless a provision explicitly states that it applies to public sector employment." (*Ibid*.) The comments further acknowledged that "[e]mployees providing patient care in a public health setting and at the University of California may currently be entitled to a meal and rest period . . . negotiated as part of" a collective bargaining agreement and the comments explained that Senate Bill 1334 would "eliminat[e] the need for these rights to be collectively bargained." (*Ibid*.)

The April 2022 bill analysis also provided a statement from the bill's author, which explained: " 'Section 512, the provision on meal periods, does not state that it applies to public employees and the Appeals Court in *Johnson v. Arvin-Edison Water Storage District* ruled that it did not. Wage orders may apply to the public sector but the Appeals Court in *Gomez v. Regents of the University of Cal.* held that Wage Order 4 did not apply to the [University of California]. Senate Bill 1334 will explicitly include public sector workers who provide direct patient care, or support direct patient care, in a hospital, clinic, or public health setting in Section 512 of the California Labor Code guaranteeing enforceable missed meal breaks

7

and rest periods for UC Nurses and other public sector workers.  Better rested nurses will provide higher quality patient care for Californians.' " (Sen. Com. on Labor, Public Employment and Retirement, Analysis of Sen. Bill 1334, *supra,* as amended Mar. 29, 2022, p. 3.)

Subsequent in the legislative process, the Senate Committee on Appropriations issued a report which reiterated that covered employees "working for specified public sector employers" would be statutorily entitled to meal and rest breaks under the bill.  (Sen. Com. on Appropriations, Rep. on Sen. Bill 1334, as amended April 6, 2022, p. 1.)  In summarizing the bill's fiscal impacts, the Appropriation Committee report focused on "costs to the University of California," and it stated that "[t]he bill would not have a fiscal impact to the Department of State Hospital (DSH), because it only applies to General Acute Care Hospitals licensed under Health & Safety (H&S) Code Section 1250(a)."  (Sen. Com. on Appropriations, Rep. on Sen. Bill 1334, *supra,* as amended April 6, 2022, p. 1.)  A staff comment included in the report stated, "The only state-operated general acute care hospitals appear be the UC hospitals."  (*Id.* at p. 2.)[5]

The bill passed the Senate in May 2022.  (Assem. J. (2021–2022 Reg. Sess.) p. 5059.)

After taking up the legislation, the Assembly Committee on Labor and Employment recommended "adding 'counties' to the definition of employer so that the definition conforms to the definition of employee." (Assem. Com. on Labor and Employment, Analysis of Sen. Bill 1334, as

---

[5] Subsequent legislative history in the Senate generally repeated the same projected fiscal impacts as well as the author's comment about the purpose of the bill.  (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading of Sen. Bill 1334, as amended Apr. 6, 2022, pp. 5–6.)

8

amended Apr. 6, 2022, p. 3.)  At the time, Senate Bill 1334 "[d]efine[d] employee to mean an employee who provides direct patient care or supports direct patient care in a general acute hospital, clinic, or public health setting."  (*Id.* at p. 1.)

Subsequently, the Assembly Committee on Appropriations issued a report that echoed the fiscal impacts projected by the Senate based on the bill's purpose to "explicitly include public sector workers who provide or support direct patient care in a hospital, clinic, or public health setting in Section 512 . . . guaranteeing enforceable meal breaks and rest periods." (Assem. Com. on Appropriations, Rep. on Sen. Bill 1334, as amended Apr. 6, 2022, pp. 1–2.)  Namely, the report concluded that Senate Bill 1334 would result in "[c]osts in the low millions of dollars annually to the University of California (UC) system."  (*Id.* at p. 1.)  It also stated that Senate Bill 1334 would cause "[m]inor and absorbable costs to the Division of Labor Standards Enforcement (DLSE)," although DLSE could not "anticipate the extent to which public employers may violate" Senate Bill 1334's provisions.  (*Id.* at p. 1.)  In summarizing existing law, the report cited the same legal precedent as the April 2022 bill analysis regarding the inapplicability of wage and hour laws to public agencies and nurses employed by the UC system.  (*Id.* at p. 2.)

In due course, the Assembly added "counties" to the bill's definition of "Employer."  (Assem. J. (2021–2022 Reg. Sess.) p. 5898; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading of Sen. Bill 1334, *supra*, as amended Aug. 15, 2022, at p. 1.)  The Senate concurred in the amendment, and Senate Bill 1334 enacted section 512.1 without further changes to the definition of "Employer."  (Assem. J. (2021–2022 Reg. Sess.) p. 6563; § 512.1.)

9

## C.    Senate Bill 1334's Text

Section 1 of the enacted version of Senate Bill 1334 adopted the Legislature's findings in support of the law.  (Stats. 2022, ch. 845, § 1.)  In this uncodified section, the Legislature stated that "[m]eal and rest periods are essential worker protections that reduce accidents, improve productivity, and promote employee wellbeing" and "meal and rest periods are important to ensuring quality care" by combatting fatigue.  (*Id.*, subds. (a), (b).)  The Legislature also made a finding that "[p]rivate sector hospital employees . . . are guaranteed meal and rest periods and a remedy of one hour premium pay for missed meal and rest breaks while such employees in the public sector lack these basic protections, even though they perform the same duties."  (*Id.*, subd. (c).)

The next legislative finding declared:  "Worker health and safety and high-quality patient care are matters of statewide concern and are the basis of numerous laws and regulations."  (Stats. 2022, Ch. 845, § 1, subd. (d).)  The last finding stated that the statute would "ensure[] equity" for covered employees.  (*Id.*, subd. (e).)

Section 2 of Senate Bill 1334 added section 512.1 to the Labor Code, which took effect on January 1, 2023.  (Stats. 2022, ch. 845, § 2; § 512.1.)

Subdivision (a) of section 512.1 specifies that "[a]n employee directly employed by an employer shall be entitled to one unpaid 30-minute meal period on shifts over 5 hours and a second unpaid 30-minute meal period on shifts over 10 hours, as provided by Section 512."  (§ 512, subd. (a).)  The provision also permits mutual waiver of a meal period and on-duty meal periods in accordance with the laws governing the private sector.  (*Ibid.*)  Similarly, subdivision (b) extends rest break rights to the same covered

10

employees as provided by the laws governing the private sector. (*Id.*, subd. (b).)

"If an employer fails to provide to an employee a meal period or rest period in accordance with this section," subdivision (c) of section 512.1 entitles the employee to a premium wage of "one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest period is not provided." (§ 512.1, subd. (c).) Subdivision (d) exempts employees who are "covered by a valid collective bargaining agreement that provides for meal and rest periods, and, if the employee does not receive a meal or rest period as required by the agreement, includes a monetary remedy that, at a minimum, is equivalent to" the premium wage compensation specified in subdivision (c). (*Id.*, subd. (d).)

As used in section 512.1, " '[e]mployee' means an employee who provides direct patient care or supports direct patient care in a general acute care hospital, clinic, or public health setting." (§ 512.1, subd. (e)(1).) " 'Employer' means the state, political subdivisions of the state, counties, municipalities, and the Regents of the University of California." (*Id.*, subd. (e)(2).)

**D.    The Memorandum of Understanding**

Prior to section 512.1's effective date, the City and the union (as the recognized representative of the non-supervisory registered nurses unit employed by the City) negotiated a collective bargaining agreement, or memorandum of understanding (MOU). The MOU set the terms and conditions of nurses' employment by the City for the period from July1, 2022 to June 30, 2024, and it included a provision regarding meal and rest breaks.

11

As to meal periods, the MOU stated nurses were to "be provided an opportunity to take a thirty (30) minute meal break per eight (8) or twelve (12) hour shift." Nurses were also entitled to compensation if they were "required to work through the meal period and [were] not provided a meal period free of duty at a later time," in which case the nurse was to "be paid for the time at the one-and-one-half-time overtime rate."

As to rest breaks under the MOU, nurses were to be provided a 15 minute rest break for every 4-hour work period "when operationally feasible." The MOU further stated that "[e]very effort will be made to ensure that the nurse has the opportunity to take rest periods," but it permitted "[c]urrent practices [to] continue by agreement of the parties." Otherwise, the MOU entitled nurses to "a fifteen (15) minute fifty percent (50%) non-pensionable premium of their base hourly rate for each missed rest break."

The San Francisco Board of Supervisors approved an ordinance adopting and implementing the MOU, giving it the force of law.

E.    The Proceedings

Plaintiffs sued the City, alleging that "[s]ince January 1, 2023, the City has failed to provide meal and rest periods, and/or one additional hour of pay, to Plaintiffs and the proposed class as required by § 512.1." Plaintiffs sought to represent a class of an estimated 2,200 nurses employed by the City. They sought to recover the alleged unpaid premiums for missed meal and rest breaks, with interest and other fees and costs, as well as a declaratory judgment that the City is required to comply with section 512.1.[6]

---

[6] The complaint also contained a cause of action for civil penalties under the Private Attorneys General Act (PAGA). The City demurred to

12

The City demurred on two grounds. First, the City argued section 512.1 "does not apply to charter cities, including the City." Second, the City argued that if section 512.1 did apply to the City, it would violate the constitutional home rule doctrine because the law "does not pertain to a matter of statewide concern" and "is not narrowly tailored to its purported goals."

Following a hearing, the trial court sustained the demurrer without leave to amend. The court ruled that "the 'clear statement' rule set forth in binding case authority" applied and found no clear indication of the Legislature's intent for section 512.1 to apply to charter cities based on the statutory text or legislative history. Plaintiffs appealed.

## II. DISCUSSION

Plaintiffs challenge the trial court's statutory interpretation of section 512.1, arguing that the City, as a charter city and county, falls within the statute's "broad definition" of " 'employer.' " Plaintiffs maintain that the Legislature evidenced its "clear intent" to regulate a municipal function because an uncodified section of the enacting statute provides the Legislature's finding that the law addresses " 'matters of statewide concern.' " Plaintiffs further urge this court to resolve the constitutional question that such a statutory interpretation would raise, arguing that section 512.1 survives constitutional scrutiny because the law appropriately regulates these purported matters of statewide concern.

---

that cause of action. While the demurrer was pending, the Supreme Court issued its ruling in *Stone v. Alameda Health System* (2024) 16 Cal.5th 1040 (*Stone*), holding that PAGA exempts public employers from penalties for violations of Labor Code provisions carrying their own penalties. (*Id.* at pp. 1049–1050.) Plaintiffs subsequently stipulated to withdraw their opposition to the demurrer to the cause of action for alleged PAGA violations.

13

We are unpersuaded that the plain meaning of the statute's definition of "Employer" extends to the City. The other aids of statutory interpretation reinforce this analysis. Faced with statutory ambiguity, we decline to construe the statute in a manner that contravenes the City's constitutional home rule authority.

## A. Standard of Review and Principles of Statutory Interpretation

We independently review orders sustaining a demurrer and issues of statutory interpretation. (*Stone*, *supra*, 16 Cal.5th at p. 1052.)

When construing a statute, our fundamental task is to ascertain the Legislature's intent and effectuate the law's purpose. (*Stone*, *supra*, 16 Cal.5th at p. 1052.) To determine legislative intent, we principally look to the statute's actual words. (*Ibid.*) We scrutinize the words themselves, ascribing to them their plain and commonsense meaning, and we construe them in context of the entire statutory framework, harmonizing the various parts of the enactment. (*Stone*, at p. 1052.) "If the language is clear, ' "its plain meaning controls" ' " because we presume the Legislature meant what it said. (*Ibid.*)

" 'On the other hand, if the language allows more than one reasonable construction, we may look to such [extrinsic] aids as the legislative history of the measure and maxims of statutory construction.' " (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 838 (*Even Zohar*).) We also will consider the Legislature's statements in an uncodified section of a statute. (*Doe v. Superior Court* (2023) 15 Cal.5th 40, 69). A canon of statutory construction of relevance here is "the familiar principle that we should address and resolve statutory issues prior to, and if possible, instead of, constitutional questions [citation], and that 'we do not reach constitutional questions

14

unless absolutely required to do so to dispose of the matter before us.' " (*Facebook, Inc. v. Superior Court (Hunter)* (2018) 4 Cal.5th 1245, 1275, fn. 31.)

## B. Section 512.1, subdivision (e)(2)'s Plain Meaning Does Not Establish that the Statute Applies to the City

Plaintiffs contend that the plain language of section 512.1's definition of "Employer" applies to the City because "[t]he City is a 'count[y],' 'a political subdivision[],' and a 'municipalit[y].' " The City disagrees. Relying on *Redondo Beach*, *supra*, 46 Cal.App.5th 902, the City does not engage in plain meaning analysis, but instead contends that "[c]ourts demand a clear indication that a California statute applies to charter cities before considering the difficult constitutional question of whether application of the statute would impinge on charter cities' home rule authority," and that no such clear indication is present here. We find both arguments unconvincing.

We agree with Plaintiffs that an analysis of section 512.1 should begin "as always" with discerning the statutory text's plain meaning because that is "the 'most reliable indicator' of legislative intent." (*Even Zohar*, *supra*, 61 Cal.4th at p. 838; *Klein v. United States of America* (2010) 50 Cal.4th 68, 77 [" 'the statutory language is generally the most reliable indicator of legislative intent' "].) If the statutory language is certain, we need no clearer indication of intent. (See *In re C.H.* (2011) 53 Cal.4th 94, 107 ["If the text reflects a plain meaning, we need go no further."]; *Conservatorship of T.B.* (2024) 99 Cal.App.5th 1361, 1379 [" 'If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction.' "].) Here, however, a literal construction of the statutory language does not yield certainty.

15

Section 512.1 regulates the meal periods, rest breaks, and compensatory premium wages of "[a]n employee directly employed by an employer" with an exception not relevant here. (§ 512.1, subds. (a)–(d).) Subdivision (e)(2) of the section defines "Employer" by enumerating, separately, "the state, political subdivisions of the state, counties, municipalities, and the Regents of the University of California." (§ 512.1, subd. (e)(2).) The statute's drafting supports a constrained reading of those terms because section 512.1, subdivision (e)(2) states that " 'Employer' *means*" the following enumerated entities. (Italics added.) In statutory drafting, "means" generally constrains the scope of the ensuing definition. (See *Stone*, *supra*, 16 Cal.5th at p. 1055.)

There is no dispute that the City is a consolidated charter city and county pursuant to Article XI, Section 6 of the California Constitution. (See *ante*, section I.A.3 [judicial notice]; *San Francisco v. Regents*, *supra*, 7 Cal.5th at p. 541.) None of the enumerated terms unambiguously encompass a "city and county" or "municipality and county."

Moreover, as a charter city and county, the City's constitutional status is that of a charter city. (Cal. Const., art. XI, § 6, subd. (b); see *San Francisco v. Regents*, *supra*, 7 Cal.5th at p. 545, fn. 2.) For this independent reason, the terms "counties" and "political subdivisions" (which plaintiffs assert applies to the City due to "its capacity as a county") do not clearly apply to the City.

Similarly, the term "municipalities" does not clearly apply to the City either. To be sure, in isolation, the term reflects a plain meaning that facially applies to the City. Black's Law Dictionary defines "municipality" as "[a] city, town, or other local political entity with the powers of self-government." (Black's Law Dict. (12th ed. 2024). But we do not view

16

words in isolation; plain meaning is derived within the statutory context. (*Stone*, *supra*, 16 Cal.5th at p. 1052.) Because section 512.1 regulates specified governmental entities, there is patent uncertainty whether the term "municipalities" encompasses local governments that are " ' " 'supreme and beyond the reach of legislative enactment' " ' " as charter cities, including the City, are. (*Redondo Beach*, *supra*, 46 Cal.App.5th at p. 910.)

Section 512.1 does not state that "Employer" means *any* municipality. (Cf. *Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 430 [" 'Generally, "any" means *all* or *every.*' "] (*Siskiyou*); *Marquez v. City of Long Beach* (2019) 32 Cal.App.5th 552, 569 [finding a wage order's minimum wage provisions applied to charter cities because it used the term " 'any city' "].) Accordingly, there are two plausible interpretations of "municipalities": those subject to general laws or all.

Although we are reluctant to embrace fully *Redondo Beach*'s approach to the plain meaning rule,[7] the case is instructive. *Redondo*

_____

[7] In our view, *Redondo Beach* is analytically flawed in two ways. First, despite purportedly turning on the constitutional avoidance canon, *Redondo Beach* first ventured into the constitution merits of the *Cal. Fed./Vista* inquiry, finding a conflict between the VPRA and the charter city's charter. (*Redondo Beach, supra*, 46 Cal.App.5th at p. 911.) Then the court analyzed the statute, putting the cart before the horse.

Second, *Redondo Beach* appears to improperly expand the context in which to assess statutory text's plain language. The court began its statutory analysis with the plain meaning rule and properly explained the rule does not look at words in isolation but construes them within the entire statutory scheme. (*Redondo Beach, supra*, 46 Cal.App.5th at pp. 911–912.) Rather than construe the VRPA's words in the context of the pertinent statutory scheme, however, the court looked at a far broader context of how the Legislature has used, and how courts have construed,

17

*Beach* dealt with a challenge to the California Voter Participation Rights Act (VRPA) on the ground it improperly infringed a charter city's plenary authority to schedule its own elections for local offices. (*Redondo Beach*, *supra*, 46 Cal.App.5th at p. 906.) The law applied to " ' "political subdivision[s]," ' " which it "defined as 'a geographic area of representation created for the provision of government services, including, but not limited to, a city . . . .' " (*Id.* at pp. 906–907.) The Attorney General issued an opinion concluding " 'the Legislature intended the Act to apply to charter cities' " based on "the purported plain meaning of 'city' and 'political subdivision.' " (*Id.* at pp. 917, 907.) The Secretary of State likewise contended "the plain language of the VRPA . . . establishes the Legislature's intent that the VRPA applie[d] to all cities . . . ." (*Id.* at p. 912.) The court disagreed, stating this conclusion failed to "confront[] the inherent ambiguity of those terms" due to the legal distinction between charter cities and general law cities. (*Id.* at p. 917.) The same ambiguity presents itself here.

Because we find the statutory definition of "Employer" susceptible of more than one meaning in these circumstances, we consider whether other principles of statutory interpretation resolve the ambiguity.

terms like "political subdivision" and "city" in other enacted statutes. (*Id.* at pp. 912–913.) Based on that judicial precedent, the court declared it needed a "clear indication" of intent in the VRPA's text that the law was intended to apply to charter cities than "the use of a general term" like "political subdivision" or "city." (*Id.* at p. 913.)

18

## C. Other Aids of Interpretation Do Not Reflect the Legislature's Intent for Section 512.1 to Cover the City

### 1. *The Legislative Findings Do Not Invoke the Home Rule Doctrine*

Plaintiffs argue that the Legislature's finding that "[w]orker health and safety and high-quality patient care are matters of statewide concern" (Stats. 2022, ch. 845, § 1, subd. (d)) invokes the constitutional home rule doctrine and therefore manifests "clear intent" to apply section 512.1 to charter cities. We are not persuaded.

First, "matters of statewide concern" is not a term of art that exclusively invokes the home rule doctrine. It is also an exception to the University of California's Regents' immunity from legislative regulation. (*Gomez*, *supra*, 63 Cal.App.5th at p. 393.) Specifically, " 'legislation regulating public agency activity not generally applicable to the public may be made applicable to the university *when the legislation regulates matters of statewide concern* not involving internal university affairs.' " (*Ibid.*, italics added.) Despite this overlap of terminology, the home rule doctrine and the Regents' autonomy are distinct. (*Id.* at p. 402 [refusing to apply home rule analysis because it found no "case wherein a court applied the four-part [home rule] test . . . to an entity other than a charter city"].)

Notably, Senate Bill 1334's legislative history demonstrates that the Legislature focused on the bill's impact on the University of California throughout the legislative process. The April 2022 bill analysis, quoting the bill's author, explicitly mentioned the holding in *Gomez*, *supra*, 63 Cal.App.5th at page 398 that " 'Wage Order 4 did not apply to the UC.' " (Sen. Com. on Labor, Public Employment and Retirement, Analysis of Sen. Bill 1334, *supra*, as amended Mar. 29, 2022, p. 3.) The author's comments then emphasized that the bill would benefit "UC Nurses and other public

19

sector workers." (*Ibid.*) The Senate Appropriations Committee's staff determined that "[t]he only state-operated general acute care hospitals appear be the UC hospitals" and mentioned no other hospitals. (Sen. Com. on Appropriations, Rep. on Sen. Bill 1334, *supra,* as amended Apr. 6, 2022, p. 2.) Both the Senate and Assembly Appropriations Committees only mention fiscal impacts to the University of California and the Division of Labor Standards and Enforcement. (*Id.*, at p. 1; Assem. Com. on Appropriations, Analysis of Sen. Bill 1334, *supra,* as amended Apr. 6, 2022, p. 1.)

Second, whether a subject is a "matter of statewide concern" is "only one side of the coin of home rule" and one step in a four-part constitutional analysis. (*Cal. Fed.*, *supra*, 54 Cal.3d at p. 13; *Vista*, *supra*, 54 Cal.4th at p. 556.) Moreover, "legislative declarations that a subject is one of statewide concern do not ipse dixit make it so." (*Cal. Fed.*, *supra*, 54 Cal.3d at p. 24, fn. 21.) The issue is a question of law, in which the court must decide whether " '*under the historical circumstances presented*, the state has a more substantial interest in the subject than the charter city.' " (*Vista*, *supra*, 54 Cal.4th at p. 558.) Courts have settled that meal and rest breaks and related compensation premiums are *not* matters of statewide concern. (See *Curcini, supra*, 164 Cal.App.4th 629; *Dimon, supra*, 166 Cal.App.4th 1276.)

Here, the Legislature's findings make no mention of those cases, how conditions have changed since those cases, or how section 512.1 is narrowly tailored to address the purported matters of statewide concern. If it had intended to challenge the constitutional status quo, the Legislature presumably would have provided a robust legislative record. (See *Vista, supra*, 54 Cal.4th at pp. 557–558 [explaining that "the [legal] inquiry is not

20

wholly removed from historical, and hence factual, realities" and therefore "[c]ourts accord great weight to the factual record that the Legislature has compiled"].) Merely declaring that "[w]orker health and safety and high-quality patient care are matters of statewide concern" (Stats. 2022, ch. 845, § 1, subd. (d)) does not demonstrate that the Legislature intended to challenge the legal precedent that meal and rest breaks and premium wages are not matters of statewide concern. (See *People v. Smith* (2024) 100 Cal.App.5th 741, 764 ["As the Supreme Court repeatedly has observed, ' " ' "[T]he Legislature 'does not . . . hide elephants in mouseholes." ' " ' "].)

Third, other provisions of the Labor Code establish that where the Legislature intends to regulate charter cities it knows how to expressly invoke the home rule doctrine in the legislative findings. For example, as the trial court observed, about a year after Senate Bill 1334 was enacted the Legislature amended another section of the Labor Code with Senate Bill No. 616 (2023–2024 Reg. Sess.) (Senate Bill 616) (Stats. 2023, ch. 309, § 1). Senate Bill 616 adopted the Legislature's finding that "establishing uniform statewide regulation of certain aspects of paid sick leave *is a matter of statewide concern and is not a municipal affair as that term is used in Section 5 of Article XI of the California Constitution.* Therefore, Sections 1, 2, and 3 of this act amending Sections 245.5, 246, and 246.5 of the Labor Code *apply to all cities, including charter cities.*" (Stats. 2023, ch. 309, § 4, italics added.)

The trial court also took notice of the more recent Senate Bill No. 159 (2023–2024 Reg. Sess.) (Senate Bill 159) (Stats. 2024, ch. 40, § 27). Among many statutory changes, Senate Bill 159 amended minimum wage schedules for covered health care employees as codified in section 1182.14. The Legislature's findings stated that "access to quality health care and

21

the stability of the health care system is *a matter of statewide concern and is not a municipal affair as that term is used in Section 5 of Article XI of the California Constitution*. Therefore, this section occupies the whole field of wages, salary, or compensation for covered health care facility employees, and *applies to all cities and counties, including charter cities, charter counties, and charter cities and counties* during the stabilization period provided by this section." (§ 1182.14, subd. (a)(6), italics added.) Then, in another subdivision, section 1182.14 expressly prohibits "any city, county, city and county, including charter cities, charter counties, and charter cities and counties" from enacting laws "applicable to a covered health care facility . . . [that] relates to wages or compensation for covered health care facility employees" and states such laws are void. (§ 1182.14, subd. (j)(1), (2).) The next paragraphs then make clear "this subdivision does not preclude any employer, including . . . charter cities, charter counties, and charter cities and counties" from taking certain other actions. (*Id.*, subd. (j)(3)–(6).)

The trial court's analysis contrasting Senate Bill 616 and Senate Bill 159 against Senate Bill 1334 was astute. The language in both Senate Bill 616 and Senate Bill 159 "indisputably conveys the Legislature's 'clear intention' that [each] legislation appl[ies] to charter cities" while "[n]o remotely comparable language is found in SB 1334."

Plaintiffs' argument that "other Labor Code sections are not in pari materia with section 512.1" is off base. Here, we are not construing the meaning of the language "a matter of statewide concern" as used in the uncodified section of Senate Bill 1334 in light of other Labor Code sections. (Cf. *People v. Tran* (2015) 61 Cal.4th 1160, 1167–1168 [" ' "It is an established rule of statutory construction that similar statutes should be

22

construed in light of one another [citations], and that when statutes are *in pari materia* similar phrases appearing in each should be given like meanings." ' "].)  Instead, we are inquiring whether that phrase demonstrates that the Legislature intended to invoke the home rule doctrine.  In that inquiry, it is not improper to consider and contrast other statutes where the Legislature has unambiguously invoked the home rule doctrine.  (Cf. *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1155 [comparing Public Resources Code, section 4516.5, subd. (d) to Gov. Code, § 51115, and concluding, "When the Legislature wishes expressly to preempt all regulation of an activity, it knows how to do so."].)

Finally, we are guided by the precept that ' "[i]f a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable." ' (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 548.) In short, if a statute is ambiguous, we adopt the less constitutionally problematic interpretation.  (See *Siskiyou*, *supra*, 237 Cal.App.4th at p. 445 [explaining the constitutional avoidance canon " 'is a tool for choosing between *competing plausible interpretations of a statutory text,* resting on the reasonable presumption that Congress [or, *mutatis mutandis,* the Legislature] did not intend the alternative which raises serious constitutional doubts' "].)

23

With this maxim in mind, we will not construe Senate Bill 1334's oblique reference to a portion of the home rule doctrine as an enunciation of the Legislature's intent that section 512.1 was intended to apply to charter cities and therefore the City.

> 2. *The Legislative History and Other Statutory Context Do Not Show A Legislature's Intent to Cover the City*

Other aids to statutory construction support our conclusion that the Legislature did not clearly intend for Senate Bill 1334 to reach charter cities or the City.

From its inception, the scope of Senate Bill 1334 was couched as applying to a subset of public employers. The April 2022 bill analysis presented the key issue to the Senate Committee on Labor, Public Employment and Retirement as whether healthcare employees "working for *specified* public sector employers including the University of California" should be granted the same meal and rest breaks as private sector workers. (Sen. Com. on Labor, Public Employment and Retirement, Analysis of Sen. Bill 1334, *supra*, as amended Mar. 29, 2022, p. 1, italics added.) The Legislature did not mention charter cities or charter cities and counties during the legislative process. As discussed *ante*, it focused on the University of California and implied an intent to overturn *Gomez, supra*, 63 Cal.App.5th 386 and *Johnson v. Arvin-Edison Water Storage District, supra*, 174 Cal.App.4th 729, neither of which pertained to the City or charter cities. The Legislature failed to mention *Curcini, supra*, 164 Cal.App.4th 629 or *Dimon, supra*, 166 Cal.App.4th 1276, which concerned the applicability of section 512 to charter counties.

The one amendment to the bill's definition of "Employer" merely added "counties." And the express reason for this change had nothing to do

24

with charter counties.[8]  (Accord *Ector v. City of Torrance* (1973) 10 Cal.3d 129, 133–134 ["After passing the Assembly in an amended form, Assembly Bill 1935 was further amended in the Senate to exclude from its reach 'a charter city and county'—i.e., San Francisco—and 'charter cities of over 2,000,000 population'—i.e., Los Angeles.  The measure was debated on the floor and narrowly defeated on its third reading. . . . We may reasonably infer that by so voting the Legislature rejected the very extension of the statute which appellant now asks us to adopt under the guise of judicial construction."] (*Ector*) superseded by constitutional amendment on other grounds as stated in *Graham v. Kirkwood Meadows Pub. Util. Dist.* (1994) 21 Cal.App.4th 1631, 1644.).)

The statutory context further dismantles plaintiffs' position.  Both section 512.1 and section 555 sit within Chapter 1 of Division 2 of the Labor Code.  (§§ 500–558.1.)  Section 555 provides:  "Sections 550, 551, 552 and 554 of this chapter are applicable to cities which are cities and counties and to the officers and employees thereof."  (§ 555.)  Since San

_____

[8] The reason given for amending the definition of "Employer" to include "counties" was that doing so would "conform[] to the definition of employee."  (Assem. Com. on Labor and Employment, Analysis of Sen. Bill 1334, *supra*, as amended Apr. 6, 2022, p. 3.)  However, in no version of the bill did the term "counties" appear in the definition of "employee."  At the time of the Assembly's amendment, the bill "[d]efine[d] employee to mean an employee who provides direct patient care or supports direct patient care in a general acute hospital, clinic, or public health setting."  (*Id.* at p. 1.)  Considering a prior comment in the Senate Appropriations Committee's report on Senate Bill 1334 that "[t]he only state-operated general acute care hospitals appear be the UC hospitals" (Sen. Com. on Appropriations, Rep. on Sen. Bill 1334, *supra*, as amended Apr. 6, 2022, p. 2), we therefore understand that adding the term "counties" to the definition of "Employer" was intended to clarify the terms "clinic" and "public health setting," as used in the definition of employee.

Francisco is the only city in California which is both a city and county, section 555 makes clear that sections 550, 551, 552, and 554 are applicable to the City. Senate Bill 1334 did not amend section 555 to include section 512.1, nor does section 512.1 reference "cities which are cities and counties." This implies the Legislature did not intend section 512.1 to apply to the City. (See *Lacy v. City and County of San Francisco* (2023) 94 Cal.App.5th 238, 247, fn. 10 ["Under 'the interpretive canon *expressio unius est exclusio alterius*, . . . the explicit mention of some things in a text may imply other matters not similarly addressed are excluded.' "].) While this implication certainly is not dispositive, and we do not announce a "requirement, formal or otherwise, to amend section 555" every time the Legislature intends to cover San Francisco, we reject plaintiffs' argument that section 555 is "not relevant."

Section 555 also offsets the import of the Labor Code's general provisions' definition of "county." The Labor Code's general provisions instruct that "[u]nless the context otherwise requires, the general provisions . . . shall govern the construction of this code." (§ 5.) Within those general provisions, " 'county' " is defined to include " 'city and county.' " (§ 14.) But the context of section 555 "otherwise requires" a narrower reading of section 14. (§ 5.) Section 555 was enacted in 1941, last amended in 1955, and expressly addresses "[a]pplicability to cities and counties" within the chapter that includes section 512.1; whereas section 14 was enacted in 1937, has not been amended since, and construes "county" for the entire code. Therefore, section 555 controls, it being the " 'later, more specific statute.' " (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 92, fn. 6.)

Moreover, in *Ector*, *supra*, 10 Cal.3d 129 our Supreme Court confronted a similar situation and determined that, in light of the constitutional home rule provisions, " 'context otherwise require[d]' " a narrow application of an intra-code definition. There, a former employee of a charter city argued that his firing by that city violated Government Code section 50083's prohibition on requiring residence as a condition of employment. (*Ector*, at p. 132.) "Appellant relie[d] on section 50001 of the same code, which declares generally that ' "Local agency" as used in this division [i.e., including § 50083] means county, city, or city and county, unless the context otherwise requires.' " (*Ibid*.) The appellant "urged that respondent is a 'city' within the definition of section 50001 and hence is bound by the prohibition of section 50083." (*Ibid*.) Because section 50083 conflicted with charter cities' explicit constitutional authority to prescribe the qualifications of their employees (Cal. Const., art. XI, § 5), our high court disagreed, stating: "[W]hen the legislation is read together with certain governing provisions of the Constitution 'the context otherwise requires' a more limited meaning for the term 'local agency' in section 50083: i.e., when the agency in question is a city, the section is intended to apply only if it is a general law city rather than a charter city." (*Ector*, at p. 132.)[9] Because applying section 14 to section 512.1 would implicate charter cities' explicit constitutional authority over their employees'

---

[9] Article XI, section 10(b), which permits "[a] city or county, including any chartered city or chartered county" to require employees "to reside within a reasonable and specific distance of their place of employment," was added to the Constitution in response to *Ector*. (*Graham v. Kirkwood Meadows Pub. Util. Dist.*, *supra*, 21 Cal.App.4th at p. 1644.) This does not impact the import of *Ector* for our purposes.

compensation, the canon of constitutional avoidance and the logic of *Ector* apply here.

## D.   Plaintiff's Other Argument Fails

Plaintiffs urge us to distinguish *Redondo Beach*, arguing that, rather than search for clear intent as that court did, we must broadly interpret section 512.1 to apply to the City because our Supreme Court requires " 'statutes governing conditions of employment . . . to be construed broadly in favor of protecting employees.' "  They contend that requiring a clear intent that the Legislature intended for meal and rest breaks to apply to charter cities "conflict[s] with precedent specific to employment."  This argument is inapposite because our holding does not turn on a "clear indication of intent" standard.

*       *       *

We do not find section 512.1's text unambiguous as to whether the statute applies to the City, and other considerations do not support the finding of such legislative intent.  Considering the City's sovereignty over its employees' compensation and bearing in mind that judicial restraint requires that we not decide constitutional questions where statutory grounds are available and dispositive, we will not infer an intent to contravene the City's home rule authority without more explicit guidance from the Legislature.

## III.   DISPOSITION

The judgment is affirmed.  The City is entitled to recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

CLAY, J.*

---

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28

WE CONCUR:

BROWN, P. J.
STREETER, J.

Trial Court:     Superior Court of California, City and County of San Francisco

Trial Judge:    Hon. Ethan P. Schulman

Counsel:     Weinberg, Roger & Rosenfeld, Caitlin E. Gray, Alexander S. Nazarov, Miranda Mammen; Kaufmann & Gropman, Aaron Kaufmann and Elizabeth Gropman for Plaintiffs and Appellants.

               David Chiu, City Attorney, Cecilia T. Mangoba, Chief Labor Attorney, and Adam M. Shapiro Deputy City Attorney, for Defendant and Respondent.

*Levy et al. v. City and County of San Francisco* – A172068